**In the United States District Court**
**for the District of Kansas**

---

Case No. 25-cr-40002-TC

---

UNITED STATES OF AMERICA,

*Plaintiff*

v.

CHRISTOPHER JAMES WILHOITE,

*Defendant*

---

# MEMORANDUM AND ORDER

A grand jury indicted Christopher Wilhoite with one count of possession of a machinegun in violation of 18 U.S.C. § 922(o). Doc. 31. Wilhoite moves to suppress the firearm found near the place of his arrest as the fruit of an unreasonable search. Doc. 40. For the following reasons, that motion is denied.

## I

### A

Wilhoite alleges the firearm was seized in violation of his Fourth Amendment rights. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Most suppression motions concern whether the search or seizure was permissible. This one concerns the reasonableness of the manner in which it was conducted. According to Wilhoite, his arrest was lawful but the officer—and his K-9 partner—used too much force to effectuate it.

An arrestee's right to be free from excessive force during an arrest is violated if the arresting officer's actions were not "objectively

reasonable in light of the facts and circumstances confronting him, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *accord Cruz v. City of Deming*, 138 F.4th 1257, 1266 (10th Cir. 2025). Courts evaluating the force used look to the totality of circumstances, paying particular attention to the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he or she was actively resisting arrest or attempting to evade arrest by flight. *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023). Bearing in mind that post hoc inquiries from the comfort and safety of a judge's chambers can provide a false sense of tranquility, this inquiry is judged from the perspective of a reasonable officer on the scene, where tense, rapidly evolving, and uncertain acts are unfolding. *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021); *accord Graham*, 490 U.S. at 396-397.

When a search has been found to violate the Fourth Amendment, the exclusionary rule has been applied to bar the use of evidence in criminal proceedings. *Mapp v. Ohio*, 367 U.S. 643 (1961); *Weeks v. United States*, 232 U.S. 383 (1914). The exclusionary rule is not a constitutional guarantee and is meant to deter future Fourth Amendment violations. *United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018).

Whether it applies to the unreasonable use of force context is less than clear. The Tenth Circuit has not addressed that specific question. But generally speaking, a defendant seeking exclusion of evidence bears the burden of showing that the incriminating evidence would not have been obtained "but-for" the Fourth Amendment violation. *United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018) (applying *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) in the context of an illegal search case). But-for causality is a necessary—though not necessarily sufficient—condition and application of the rule requires that "the benefits of deterrence must outweigh the costs." *Herring v. United States*, 555 U.S. 135, 141 (2009) (citing *United States v. Leon*, 468 U.S. 897, 910 (1984)).

**B**

On December 20, 2024, at around 11:45 p.m., a single Topeka Police Department officer responded to a reported burglary at 3200 SW

Eveningside Drive in Topeka, Kansas.[1] The caller reported that multiple men had broken into one of the apartments.

The first officer, Bradley Netherton, arrived on the scene at approximately 11:52 p.m. Officer Chris Janes was the next to arrive. At 11:52:40 p.m., Janes exited his car, deployed his K-9 "Rebo," and turned on his bodycam. Janes and Rebo then took position on the south side of the apartment building.

Netherton took position alone at the base of the stairs to the apartment complex and waited for additional units to arrive before going up the stairs. There he observed three men "ransacking" an apartment on the second story balcony. Netherton drew his weapon, announced his presence, and ordered the men to stop. They did not comply. Instead, they started running. Netherton pursued and quickly intercepted one of the suspects, leaving two at large. Janes, still positioned on the south side of the building, heard Netherton shouting at the suspects to stop.

The following sequence of events occurred in a matter of seconds and were captured on Janes' bodycam. Upon hearing Netherton's statement, Janes, with Rebo, ran toward the east side of the building. As soon as he rounded the corner of the building, he and Rebo immediately encountered an unknown man—later determined to be Wilhoite—initially at a distance of 15-20 feet but running directly toward them.

Without a warning, Janes released Rebo to assist in apprehending Wilhoite. Wilhoite then changed the direction of his flight, turning toward a nearby retaining wall and bushes. As Wilhoite approached the wall, Rebo grabbed onto the lower backside of Wilhoite's jacket. Wilhoite and Rebo jumped from the retaining wall, with Wilhoite landing face down on the grass below.[2] This encounter, it was later determined,

[1] The following facts were found based on the evidence produced at the suppression hearing, namely, Janes and Netherton's testimony and the AXON bodycam footage captured by Janes. Doc. 43.

[2] The fall caused Wilhoite to suffer two broken legs and other associated injuries. Wilhoite, during the suppression hearing, confirmed he was making no claim relative to either the extent of his injuries or the subsequent interactions with Janes (and Rebo) while he was being apprehended.

dislodged a firearm from Wilhoite's person. Rebo maintained his hold on Wilhoite's jacket upon landing on the grass.

Janes followed, commanding Wilhoite to put his hands up and then put his hands behind his back. Wilhoite did not do so. Janes drew and activated his Taser, deploying one probe into Wilhoite's back and additional probes into each of his hamstrings. Wilhoite then complied and Janes commanded Rebo release his grip. After Rebo released his grip, Wilhoite moved his left arm beneath his chest. Janes then commanded Rebo to bite Wilhoite's left wrist. At that point, Janes was finally able to get Wilhoite into handcuffs and called an ambulance for Wilhoite's injuries.

Netherton subsequently recovered a Glock 19 from the bushes at the base of the retaining wall that was dislodged by Rebo's contact with Wilhoite. That weapon had an extended magazine and a modified switch enabling automatic discharge. *United States v. Kuone*, 2025 WL 1784973 at *1 (D. Kan. June 27, 2025) (describing a Glock switch as a small piece of plastic that allows a semi-automatic Glock pistol to function as if it were a fully automatic machine gun).

Wilhoite moves to suppress the firearm. Doc. 40 at 4.[3] The syllogism he offers is that Janes' release of Rebo without warning constituted unreasonable force in executing the seizure, the contact Rebo made with him dislodged the firearm, and that, as a result, the firearm should be excluded. *Id.* at 7.[4] An evidentiary hearing on the motion to suppress was held on September 17, 2026. Doc. 43.

---

[3] All document citations are to the document and page number assigned in the CM/ECF system.

[4] Wilhoite also argues the firearm should be excluded because the use of a K-9 without a warning and the subsequent use of Taser force and pain compliance "shocks the judicial conscience" in violation of the Fourteenth Amendment. Doc. 40 at 10. That claim fails as a matter of law. First, Janes' use of reasonable force to apprehend a potentially armed, fleeing burglary suspect does not shock the conscience. *See Lindsey v. Hyler*, 918 F.3d 1109, 1116 (10th Cir. 2019) (citing *Lewis*, 523 U.S. at 846). And second, even assuming the use of force once Wilhoite was on the ground constitutes a Fourteenth Amendment violation, it is immaterial to this suppression motion because it did not affect discovery of the gun. Doc. 41 at 3; *cf. Rochin v. California*, 342 U.S. 165, 209-210 (1952).

## II

Janes' use of his K-9 to apprehend Wilhoite, a suspect of a serious and ongoing crime who was running at him, does not constitute the use of unreasonable force. Even if it did, exclusion is not the appropriate remedy. Accordingly, Wilhoite's motion is denied.

### A

Wilhoite argues that Janes' use of his K-9 without first giving a verbal warning constituted an unreasonable use of force. Doc. 40 at 4.[5] Based on the facts as they reasonably appeared to Janes at the time of the encounter, it was not.

#### 1

Wilhoite, as he must, concedes that Janes was investigating a serious crime. Doc. 40 at 1, 6. Generally speaking, burglary is a felony in Kansas. Kan. Stat. Ann. § 21-5807. This factor alone weighs against Wilhoite. *Vette*, 989 F.3d at 1170.

In addition, Janes reasonably perceived the suspect—Wilhoite—to pose an immediate threat to his and the other officers' safety. As set forth in greater detail below, this factor, sometimes called "the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force," *Vette*, 989 F.3d at 1170, cuts decidedly in the Government's favor.

It was objectively reasonable for Janes to believe that Wilhoite presented a threat to the officers' and public's safety. Janes was responding to a burglary in progress in the middle of the night and rounding the east corner of the building when he immediately encountered Wilhoite, who Janes knew had already ignored Netherton's command to stop, running toward Janes from a distance of 15-20 feet. Not only was the situation tense, fluid, and uncertain, but Janes testified that, in his experience, most burglary suspects carried arms. *See Marquez v. City of Albuquerque*, 399 F.3d 1216, 1221 (10th Cir. 2005) (considering officer's

---

[5] The Government does not contest that Wilhoite was seized in the arrest made on December 20, 2024. Doc. 41 at 5. Neither does Wilhoite contend that the police lacked either probable cause to effectuate an arrest or reasonable suspicion to make an investigative stop.

testimony that one quarter to one half of robbery suspects are armed in concluding officer had a reasonable belief that suspect was potentially armed). And, generally speaking, the Topeka Police Department considers all burglaries particularly high-risk incidents. As a result, a reasonable officer could objectively believe a potentially armed, fleeing burglary suspect running in his direction at nighttime in a residential area presented a threat to himself and other officers on the scene. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1321 (10th Cir. 2009) (holding it was reasonable to use a K-9 to apprehend an armed suspect hiding in a residential neighborhood at nighttime).

Additionally, Janes testified that the officers were divided on scene and outnumbered by fleeing suspects, which made the situation extremely dangerous. *See Marquez*, 399 F.3d at 1221 (noting that the situation was "tense and rapidly evolving" as the solo officer was outnumbered by two potentially armed robbery suspects evading arrest). In such a rapidly escalating situation, Janes was "forced to make [a] split-second judgment[] … about the amount of force" he thought was necessary to apprehend Wilhoite. *Graham*, 490 U.S. at 397; *see also Marquez*, 399 F.3d at 1221. Janes' use of force—here, the deployment of his K-9 without a verbal warning—was reasonable given the threat presented by the potentially armed suspect he encountered alone in the dark before backup units had arrived. *See Marquez*, 399 F.3d at 1221 (finding officer acted reasonably in using police K-9 to apprehend suspected burglary accomplice he believed endangered public safety when she fled the scene after ignoring commands to stop).

And finally, Wilhoite's attempt to evade arrest by flight also weighs in the Government's favor. Wilhoite, prior to encountering Janes, was found ransacking an apartment during a burglary, had already ignored Netherton's command to stop, fled from that encounter, and nearly ran into Janes and Rebo during his flight. These facts also decidedly point in favor of the Government's use of force. *See Palacios*, 61 F.4th at 1257-58 (the third *Graham* factor favored the Government's use of force because the suspect fled from police after he ignored their commands); *Marquez*, 399 F.3d at 1221 (suspect's attempt to evade arrest by running away and trying to climb a wall favored the Government).

* * *

The totality of the circumstances show that Janes' use of force was reasonable. Janes, isolated from the other officer on scene, was responding to a burglary in progress—a serious crime—when he

suddenly encountered a fleeing, potentially armed suspect running towards him in the dark. The rapidly evolving situation objectively presented an immediate threat to his and public's safety. *Marquez*, 399 F.3d at 1221; *Thomson*, 584 F.3d at 1321. Accordingly, Janes' use of Rebo without a warning to apprehend Wilhoite was reasonable.

**2**

Wilhoite offers several arguments to the contrary. None support a different conclusion.

First, he argues Janes' decision not to warn Wilhoite prior to releasing Rebo was unreasonable. Doc. 40 at 6. But providing a warning is not always required, especially when the officer—as here—was immediately confronted with a tense, rapidly-evolving, and dangerous situation. *Thompson*, 584 F.3d at 1321 (holding it was reasonable to use a K-9 without warning to apprehend an armed suspect hiding in a residential neighborhood at nighttime). This is true even if, as Wilhoite sought to convey during the hearing, the police department's policy encourages such warnings. *See, e.g.*, *Marquez*, 399 F.3d at 1222 (noting that a violation of police procedure does not mean an officer acted unreasonably in using force).

And *Chavez v. City of Albuquerque*, 402 F.3d 1039 (10th Cir. 2005), is inapposite. *Contra* Doc. 40 at 6–7. It is true that the Tenth Circuit described a factual situation where the officer gave a K-9 warning, but that is a factual circumstance. At no point did the Tenth Circuit consider whether—much less hold—such a warning was constitutionally required.

Wilhoite also attempts to invoke the injuries he suffered after his attempted evasion and Janes' subsequent use of force as support for his challenge to Janes' initial decision to deploy Rebo without a verbal warning. Doc. 40 at 7. That argument is a non sequitur. As discussed, the decision to use Rebo to apprehend Wilhoite was neither unreasonable nor disproportionate to the rapidly evolving situation Janes faced. *See Marquez*, 399 F.3d at 1221 (finding that use of a K-9 to apprehend a suspected burglary suspect fleeing the scene after ignoring commands to stop was reasonable). The subsequent physical consequences of Wilhoite's attempt to evade the dog—broken legs from jumping off the wall to evade capture, for example—is not causally related to the earlier dislodging of the weapon at issue in his motion. Neither is Janes' later decisions to use Taser and other pain compliance techniques on

Wilhoite once he was on the ground. So, any argument about the resulting injuries or subsequent use of force once he was prone on the ground is immaterial to his challenge.

And *Graham* recognized that the Fourth Amendment's reasonableness standard includes the practical fact that the ability to effect an arrest necessitates at least some degree of force. *See Graham*, 490 U.S. at 396; *Helvie v. Jenkins*, 66 F.4th 1227, 1239 (10th Cir. 2023) (stating that when making an arrest, some degree of physical force is inevitable, particularly when suspect is attempting to evade arrest). That means the amount of force and the discretion to select it varies based on the facts and circumstances being confronted. For example, the Supreme Court has recognized that firing multiple shots—even if, in hindsight, only a few were necessary—at a suspect presenting a severe threat to public safety is not unreasonable because the need to use deadly force continues until that threat is abated. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). Similarly here, Janes was responding to a credible threat to officer safety when he used Rebo to apprehend a fleeing, potentially armed burglary suspect while alone in the dark. And that use of force was justified by Wilhoite's continuing efforts to evade and thwart the arrest until that encounter became secure. *Thompson*, 584 F.3d at 1316 (noting that using police K-9s to apprehend suspects can obviate the need to resort to deadly force or firearms).

**B**

On the assumption that his rights were violated by the unreasonable use of force, Wilhoite argues exclusion is the proper remedy. Doc. 40 at 7. It is not.

**1**

The exclusionary rule is meant to ensure that the Government does not intrude on the Fourth Amendment's right to privacy. *Knox*, 883 F.3d at 1273. It accomplishes this by generally forbidding the Government from using evidence obtained during an illegal search and seizures. *Id.*

Its lineage traces back to *Boyd v. United States*, 116 U.S. 616 (1886). In that case, the Court likened illegal searches—that is, searches without lawful justification—to compelled self-incrimination. The *Boyd* Court stated that it is "the duty of courts to be watchful for the constitutional rights of citizens, and against any stealthy encroachments

thereon," *id.* at 630, particularly those that interfere with personal security and liberty, *id.* at 635. Decades later in *Weeks*, 232 U.S. at 391-92, the Court first excluded evidence seized without a warrant in a federal prosecution, reasoning that without exclusion, the Fourth Amendment would have no effect in securing citizens from unlawful searches and seizures. In *Mapp*, 367 U.S. at 647-48, 655, the Court extended the remedy to the states. It maintained a "jealous regard for … the integrity of individual rights" when holding that evidence seized in violation of the Fourth Amendment must be suppressed. *Id.*

But the rule itself is not a constitutional guarantee. *Knox*, 883 F.3d at 1273. Its sole purpose is to serve as a deterrent for constitutional violations. *Davis v. United States*, 564 U.S. 229, 237 (2011). It is not a personal right nor is it meant to redress injuries suffered as the result of an unlawful search. *Id.* The rule is "calculated to prevent, not repair" and is "restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 347-48 (1974).

Indeed, whether the exclusionary rule applies is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Leon*, 468 U.S. at 906 (internal citation omitted). There is no per se or "but-for" exclusionary rule. *Id.* at 910-11. While real deterrence is a necessary condition for exclusion, "the exclusion analysis must also account for the substantial social costs generated by the exclusionary rule," such as the loss of reliable evidence. *United States v. Little*, 119 F.4th 750, 766 (10th Cir. 2024), *cert. denied*, 146 S. Ct. 202 (2025) (internal citation omitted). Because the rule often "suppress[es] the truth and set[s] the criminal loose in the community without punishment," this bitter pill must be swallowed only as a last resort. *Id.*

**2**

Wilhoite's motion contends evidence must be suppressed when it is the but-for product of an unreasonable seizure. Doc. 40 at 7-8. He exclusively focuses on the causal link, arguing that exclusion of the gun is required because "but for the dog's forceful apprehension, the firearm would not have been dislodged from Mr. Wilhoite's hands and discovered when and where it was." Doc. 40 at 8. That framing fails on at least two fronts.

First, it presumes that exclusion is an available remedy for an excessive force violation. Not only was the force not excessive, *see* Part II.A., *supra*, but exclusion is not a proper remedy for excessive force claims.

Although the Tenth Circuit has not directly addressed the issue in a case asserting excessive force, it has frequently recognized that exclusion in unlawful search cases "is not an automatic remedy." *See e.g.*, *Little*, 119 F.4th at 766. The few circuits that have considered the issue uniformly agree that it is not an available remedy in excessive force cases. *United States v. Collins*, 714 F.3d 540, 543 (7th Cir. 2013) (rejecting exclusion as a remedy to excessive force because the rule imposes great social costs and a civil suit for damages is the appropriate remedy); *see also United States v. Garcia-Hernandez*, 659 F.3d 108, 114 (1st Cir. 2011) (same); *United States v. Morales*, 385 Fed. App'x 165, 167 (3d Cir. 2010) (same). So, too, for the handful of district court cases across the country to have considered it. *United States v. Cruz*, 2022 WL 7131928 at *4 n.3 (E.D.N.Y. Oct. 12, 2022) (noting that even if there was excessive force, the appropriate remedy is a civil suit, not suppression); *United States v. Brewer*, 2025 WL 3638155 at *2 (D.D.C. Dec. 15, 2025) (same). When questioned about the state of the law at the hearing, Wilhoite acknowledged there was no authority in the Tenth Circuit or other circuit courts supporting his contention that exclusion was a proper remedy for an excessive force claim.

Good reasons exist not to extend the exclusionary rule beyond the illegal search and seizure realm. Exclusion is appropriate only when "the deterrence benefits of suppression ... outweigh its heavy costs." *Davis*, 564 U.S. at 237. Law enforcement conduct that is "deliberate," "reckless," or "grossly negligent" makes the "deterrent value of exclusion ... strong." *Id.* at 238. In other words, it encourages officers to limit their unilateral discretionary investigative choices by encouraging presentment of the issue to a neutral and detached judge except in limited circumstances. On the other hand, an "objectively reasonable good-faith belief that [one's] conduct is lawful," or conduct involving only "isolated negligence," makes for a low deterrent value. *Id.* (citations and quotation marks omitted). Wilhoite makes no argument that these values supporting the exclusionary rule in the search and seizure context could ever be advanced by a post-hoc determination that the force used to affect an arrest was excessive. *See United States v. Pemberton*, 94 F.4th 1130, 1137 (10th Cir.), *cert. denied*, 145 S. Ct. 604 (2024) (noting that application of the rule must either alter the behavior of officers or

the policies of their department responsible for the misconduct). Instead, the potential for civil liability and damages provides a meaningful check on an officer's conduct and a path for a plaintiff to pursue any claim he or she may have. *See e.g. Collins*, 714 F.3d at 543. Consistent with that reasoning, even if Janes' conduct could be described as excessive force, there is no persuasive argument that exclusion would be an effective deterrent in this type of split-second encounter.[6]

Second, there is no causal connection between the force used and the discovery of the firearm. The firearm was dislodged when the K-9 confronted Wilhoite, yet most of his arguments focused on the incidents that occurred or the injuries suffered arising from his attempt to flee the K-9. Moreover, there is no dispute that even if the weapon had not been dislodged by that encounter, it would have eventually been found once Wilhoite was on the ground and searched incident to that arrest. And exclusion of this gun may actually undermine the safety of the officer(s) and public, causing Janes or his colleagues to hesitate in effectuating an otherwise lawful arrest. *See Hudson v. Michigan*, 547 U.S. 586, 587 (2006) (stating that "[i]f the consequences of running afoul of the rule were so massive, officers would be inclined to wait longer than the law requires [to effectuate a warrant]—producing preventable violence against officers in some cases"). Any conceivable deterrent effect is outweighed by such substantial social costs. *See id.* Accordingly, Wilhoite has not shown—even if he had been subject to excessive force and that exclusion is an available remedy—that the gun should be suppressed because of Janes' decision to release his K-9, Rebo.

---

[6] During the hearing, counsel suggested that *United States v. Quintanilla-Chavez*, 807 F. Supp. 3d 641 (W.D. Tex.), *reconsideration denied*, 811 F. Supp. 3d 839 (W.D. Tex. 2025), may have reached a result favorable to his position. There, a district court concluded that exclusion was the proper remedy because that defendant had no available remedy under *Bivens*. *Id.* at 667. That case is not helpful to Wilhoite. For one, he was not subject to excessive force and, even if he had been, he has not argued that he lacks a civil remedy. For another, the Tenth Circuit requires more consideration as to the need for exclusion than the Texas court provided. *See Little*, 119 F.4th at 766. And finally, that decision is not even binding on the judge that issued it, much less in the District of Kansas. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). So, whatever may be said of *Quintanilla-Chavez*, it provides no help to Wilhoite.

**III**

For the foregoing reasons, Wilhoite's Motion to Suppress, Doc. 40, is DENIED.

It is so ordered.

Date: October 9, 2026

s/ Toby Crouse
Toby Crouse
United States District Judge